Jordan, C. J.
This is an action by the appellee to recover damages for the alleged negligence of appellant, which resulted in her sustaining serious personal injuries. There was a special verdict, and upon the facts found the trial court awarded appellee a judgment. On July 5,1890, the time of the accident, appellee, who was about seventeen years of age, accompanied by her brother, who was fifteen years old, and also by another boy of the age of fourteen years, was riding in a light spring wagon, taking flowers to market in the city of Indianapolis. At a point on East street, a public street in said city, where appellant’s railroad track crosses said street, the horse attached to the wagon became frightened and ran away, by reason of appellant’s alleged negligence in permitting and suffering the steam in one of its engines standing near the crossing to escape with a loud and unusual noise.
This is the second appeal of this cause by appellant. See 134 Ind. 16. It was held, in the former appeal, that, under the issues as then formed, the evidence did not support the verdict of the jury, and the judgment was reversed. After the cause was certified back to the lower court, the issues were reformed and two additional paragraphs to the complaint were filed. It is clearly disclosed that the special verdict rests *638 upon the second paragraph of the complaint, and for this reason alone appellant cannot predicate available error upon the action of the court in adjudging, upon demurrer, the first and third paragraphs sufficient. It is substantially alleged in the second paragraph that appellant’s railroad runs through the city of Indianapolis, Indiana, and crosses East street, a public street and highway in said city, and that this crossing is much used at all hours of the day and night by persons riding in carriages, wagons, and other vehicles, all of which was well known to appellant at the time of the accident; that on July 5, 1890, the appellant carelessly and negligently ran and moved one of its locomotive engines, with two freight cars attached thereto, and stopped the same near to said crossing and highway for the purpose of remaining there a long and unreasonable length of time, and carelessly and negligently permitted the same to remain at said point for an unreasonable period of time, where the hissing noises, smoke and confusion made by escaping steam were liable to frighten horses drawing vehicles along-said East street and over said crossing; that at the time said engine was stopped at the said crossing it “had on” an excessive amount of steam that was not necessary for its work, and that the carrying of such a high pressure of steam at such a time and place, under the circumstances, was negligence upon the part of the defendant; that when the defendant so negligently moved said locomotive near to said crossing and stopped at said point, the steam gauge indicated that the steam in the boiler was liable to escape through the automatic safety valve at any moment and make a loud hissing and unusual noise, unless regulated and controlled, as the defendant at the time knew, and was thereby liable to frighten horses drawing vehicles along said street and over said crossing, thereby *639 causing them to become unmanageable, and. run away, as the defendant well knew; that while the said engine, with said cars attached, was standing near to said crossing, as aforesaid, the plaintiff, Anna Schmidt, was driving along and upon said street in a spring wagon, drawn by a quiet and gentle pony or horse, that with her in said wagon were her brother, Joseph Schmidt, and one Eddie Halley; that as she approached said crossing for the purpose of crossing the same, she sent said Halley to the servants in charge of said engine to ascertain if it was safe for her to drive over the crossing and railroad track at that time; that the servants in charge of said engine, and the flagman of defendant at said crossing, with the full knowledge of the danger of the steam escaping from said engine, as aforesaid charged, informed the plaintiff that it was safe for her to cross, and signaled and invited her to cross, and she, believing from said information and invitation, that it was safe to cross, and that no harm would result, started to- drive over said crossing, and while driving over the same she was compelled to drive near to said engine, for the reason that it was negligently stationed near to the crossing; that while in the act of driving over the crossing and when near to said engine the defendant, without, any notice or warning, carelessly and negligently suffered and allowed the steam to escape from the boiler of the engine, thereby making a very loud blowing, hissing, and unusual noise, which escape the defendant could have avoided by the exercise of reasonable care. It is further averred that the escape of the steam as alleged so frightened plaintiff’s horse that it became unmanageable and ran away and upset the wagon in which she was riding, and that she was thrown out and severely injured, etc.
*640 Appellant makes no specific charge of insufficiency ■against this paragraph, and we are of the opinion that it contains sufficient facts to constitute a cause of actionable negligence. Appellant’s counsel in the main contend that the special verdict does not respond to or support the issue as made by the second paragraph of the complaint, that the verdict does not support the judgment, and that the former is not sustained by the evidence. The facts found by the jury bearing upon the question of the alleged negligence in the second paragraph appear to be as follows: The line of the defendant’s railroad crosses East street, one of the public streets in the city of Indianapolis, Indiana, in the populous part of the city; that said East street at said crossing was on July 5,1890, much used by the public in crossing with wagons, carriages and other vehicles; “that on the morning of the 5th day of July, 1890, the defendant by its agents and employes, took one of the engines from the building where it kept its engines, designated as a round house, a distance of a few hundred feet from said East street crossing, and backed said engine down to and across said East street to a point about twenty-five or thirty feet west of the west line of said crossing; that at the time the said engine was brought down from said round house to said crossing, said engine carried from 130 to 140 pounds of steam; that at the time said engine came to and passed said crossing, two cars and a caboose, standing on defendant’s switches, west of said crossing, were attached to said locomotive; that after said cars were so attached to said engine, said engine and cars were moved up to within twenty-five or thirty feet of the west line of said East street crossing, to await orders to go to the yards of the defendant, two or three miles distant, to make up a freight train there to go to *641 Monon, in the northern portion of the State of Indiana.”
“Fourth. That at the time that said engine came to said East street crossing, from said round house, it carried an unnecessary and excessive amount of steam for the work it was intended said engine to do, and did do at that time; that eighty pounds of steam would have been amply sufficient for the work which said engine did and was intended to do at that time.
“Fifth. Said engine at said time had on it as a part of its appliances, a steam gauge, which indicated the amount of steam pressure in the boiler of said engine; that said steam gauge had on it a dial of about six inches in diameter, with figures on the outer rim thereof, and a hand to indicate the amount of steam pressure, and that the amount of steam pressure could be easily seen at a distance of seven feet.
“Sixth. That said engine also had upon it an automatic safety valve, a device in general use for the purpose of permitting the escape of steam automatically when the pressure of steam reached a given point; that the automatic safety valve of said engine was so adjusted that the steam would escape automatically when the pressure of steam reached 140 pounds, and when said steam gauge indicated a pressure of 140 pounds the steam would escape through the automatic safety valve, and make a loud, blowing and hissing noise; that said device was made and adjusted by the manufacturer of the engine, sealed up, and could not be adjusted or changed by anyone in charge of- the engine. And whenever the steam was permitted to reach a pressure of 140 pounds no one controlling the engine could prevent the escape of the steam, or the noise consequent therefrom; that said automatic safety valve and the steam gauge were of the most modern and approved appliances, and were *642 ill general use and were used for the purpose of avoiding the danger incident to a too high steam pressure.
“Seventh. That the engineer in charge of said engine looked at the steam gauge at the roundhouse and saw and knew that it indicated a steam pressure of from 130 to 140 pounds; and that he also saw the steam gauge at the East street crossing and knew that the steam pressure was increasing and was now 140 pounds, and that the steam was liable to escape through the safety valve at any moment.
“Eighth. That the steam pressure on said engine at said time could have been controlled by the persons in charge thereof, and the increase of such pressure prevented, either by regulating the fire, or by opening the doors of the furnace, or. by closing the dampers, and such means may be employed to prevent the increase without injury to the machinery; and in addition, the same result may be obtained by letting the 'steam escape into the tank, if the water in the tank is not too hot, and by letting cold water into the boiler, if the boiler is not too full, but the evidence- in this case fails to show whether the water was hot in the tank or whether the boiler was full of water.
“Ninth. That at no time after the engineer in charge received said engine at the roundhouse up to the time of the injuries to the plaintiff hereinafter mentioned did any one in charge of said engine employ any means to reduce steam pressure on said engine, or to prevent its increase.
“Tenth. That on the 5th day of July, 1890, while said engine was standing as aforesaid, about twenty-five or thirty feet west of the said East street crossing, and while said engine was in the condition as aforesaid, the- said plaintiff, Anna Schmidt, in company with her brother, Joseph Schmidt, and another boy, by the name of Edward Halley, was driving north on *643 ■said East street, in a spring wagon, filled with flowers for sale in the market, whither they were going; that when they came near to said East street crossing, they saw said engine standing on said track, as aforesaid, and before they attempted to cross, stopped their horse and wagon, and said Joseph Schmidt sent the boy, Eddie Halley, to the persons in charge of said engine, to inquire if it was safe to cross said tracks at that time; that said Halley went to the engineer in charge of said engine, and inquired of him if it was safe to cross the tracks at that time; that- said engineer answered ‘yes/ and further said that ‘they were not going to pull out for half an hour/ that said engineer knew at that time, the steam in the boiler of said engine was liable to escape through the automatic safety valve at any moment, with a loud, hissing noise, likely to scare and frighten horses; that said Halley went to the flagman, stationed on the north side of said crossing, and asked him if they could cross. He said ‘yes/ and signaled them with his flag to come across and that the said Halley also called to them and waved his hand for them to come across; that said Joseph Schmidt, who was driving, then started to” go across, and when he came near to said engine, the steam escaped from said automatic safety valve of -said engine, with a very loud and unusual noise, which frightened said horse, and caused him to become unmanageable, and to run away and upset said wagon and throw said plaintiff into the gutter near the flagman’s shanty, and breaking her leg and otherwise injuring her internally; that said horse was a quiet and gentle horse, and used to the cars, and that the driver, Joseph Schmidt, was accustomed to ■ the use of and driving horses; that at said time he was fifteen years of age, and did all he could to check and control said horse.
*644 “Eleventh. That the evidence does not show the precise length of time said engine was standing near said crossing, but it does appear from the evidence that it was several minutes, and the engineer and fireman were at, and on said engine oiling and cleaning it; that.a portion of the time the fireman was on the north side of said engine, and the engineer was on the south side thereof; that the foreman of the crew running said engine, was reading orders while at said crossing, but it was not shown whether or not the order was to move or when to move, or whether the movement of said engine was in pursuance of said order or not; the track on which said engine was standing was the third or fourth on the north side of said crossing.”
Briefly stated, the special verdict, among other things, discloses that on the day of the accident the appellant, by its servants, took the freight engine in question from the roundhouse, a short distance from the East street crossing and backed it to a point near to said crossing, and there stopped the engine and the cars attached to it to wait orders to go to the yards of appellant some two or three miles distant; that at the time the engine reached the crossing, and while it remained there it carried an unnecessary and excessive amount of steam for the work that it was to perform; that East street is in a populous part of the city of Indianapolis, and both the street and crossing-are much used by persons passing in vehicles drawn by horses; that the engine remained there for several minutes, the precise time not being shown by the evidence, and while standing near the crossing the engineer or fireman thereon were engaged in oiling and cleaning the engine, and while so standing the engineer saw and knew that the steam pressure was increasing, and had already reached 140 pounds, the point of explosion, and that it was liable, at any *645 moment, to escape through the valve. With knowledge of these facts it appears that no precaution whatever was taken by appellant to stop the increase of the steam pressure and thereby prevent it from escaping as it did, although, as disclosed by the verdict, some simple methods or means might have been employed to avoid that result. Under these circumstances appellant invited appellee to cross and gave assurance to her that it was safe for her to go over the crossing, and while in the act of so doing the steam w'as suffered or permitted to escape or blow off -with a very loud and unusual noise which frightened her horse and resulted in the injury of which she complains. The special verdict, in our opinion, substantially responds to the second paragraph of the complaint, and the facts embraced therein, under the circumstances, impute actionable negligence to appellant. The rights and duties of these parties at this public crossing were mutual, or equal, and both were respectively bound to do what the law required. Ohio, etc., R. W. Co. v. Walker, 113 Ind. 196, 3 Am. St. 638. She, under the circumstances, had the right to pass over the tracks of appellant, but in doing so, however, she was bound to exercise ordinary care and diligence to avoid injury. There is nothing to indicate that she was not in the exercise of such care upon her part, while upon the other side it may be said that the appellant had the legal right, in the line of its business, to move its engine to the point near the crossing where it did, and there stop; however, in permitting the engine to stand there as it did, it was bound to exercise this rightwith due regard for the safety of others using this crossing. Or in other words, the appellant, under the circumstances, was required to exercise such ordinary care and diligence as to avoid injury to those traveling upon this street and over the crossing in *646 controversy. The law interprets ordinary care to be of that degree which a person of ordinary prudence, under the particular circumstances is presumed to exercise to avoid injury. Such care is required to be in proportion to the danger to be avoided and the fatal consequences that may result from the neglect. Toledo, etc., R. W. Co. v. Goddard, 25 Ind. 185.
In Billman v. Indianapolis, etc., R. W. Co., 76 Ind., at p. 174, 40 Am. Rep. 230, it is said: “The liability of horses to take fright at unusual noises or objects is a thing to be apprehended and guarded against.” It is a settled rule that the ordinary use of a locomotive engine by a railroad company, or the ordinary sounding of the whistle attached thereto on proper occasions, or the escape of its steam, in like manner, is not negligence. But these rights must be exercised in a lawful manner. The negligent or careless sounding of the whistle or the blowing off of steam, at a public street, or highway, or at a public crossing, in such a manner as to make an unusual noise and thereby cause horses driven, along or over such street, highway, or crossing to take fright, which results in an injury, is an actionable wrong. Indianapolis, etc., R. W. Co. v. Boettcher, 131 Ind. 82; Cincinnati, etc., R. W. Co. v. Gaines, 104 Ind. 526, 54 Am. Rep. 334.
The rule which applies to affirmative acts of negligence in such cases is also applicable to negligence through the omission of a legal duty, whereby the steam is permitted to escape or blow off in like manner to the injury of others. It is a well recognized legal proposition that actionable negligence may consist in either omitting to do under the particular exigencies or circumstances what a reasonable and prudent person would ordinarily have done, or in doing that which he would not have done. The fault of the wrongdoer may lie in, or arise out of his act of omis *647 sion as well as that of commission, in regard to a legal duty. 16 Am. and Eng. Ency. of Law, pp. 404 and 405; Wharton’s Law of Negligence, sections 1, 3, and 83.
Tested by these rules, it is clear, we think, that under the particular circumstances and facts, the appellant must be adjudged guilty of negligence in like manner as though the steam upon the occasion in controversy had been blown off through the active agency of its servants in charge of the engine. When all of the facts in the case are considered, appellant’s liability cannot be successfully controverted. It placed the engine at the crossing (over which persons at all times were passing with horses) under an excessive and unnecessary pressure of steam, and permitted it to stand there for a period of time, long enough at least to warrant its employes in charge to engage in oiling and cleaning the machinery, without exercising any care or employing any of the means or methods which the jury find it could have employed, to control or reduce the steam, and thereby prevent it from escaping in the manner it did. While it is true the valve appears not to have been under the control of the engineer and was liable to let the steam escape automatically when it had reached a certain pressure, still the fire which produced the steam was under the control of appellant’s servants, and the jury find that the increase of the steam could have been prevented by regulating the fire or by opening the doors of the furnace or by closing the dampers. These means apparently were practicable and could be employed without any injury to the machinery, as the finding discloses. None of these were used, but the steam pressure was permitted to increase until it had reached a point where it was liable to blow off at any moment, and with this fact evident to the engineer, affirmative assurance of safety was given to appellee and she was invited to *648 cross and thereby subjected to a peril of which she had no knowledge, but which was well known to appellant. Having been thus invited, she had the right to presume that necessary precautions had been taken by appellant to render the act of her crossing safe, at least so far as any of its acts were concerned. Under the circumstances she had no reason to apprehend that the steam in the engine was not under control, and while passing, would escape as it did, and alarm her horse. The authorities affirm that when a person rides or drives up to a railroad crossing by the invitation or direction of a flagman or gate keeper there stationed, and is injured at such crossing from trains, machinery or appliances of the railroad company, hé has the right to recover, because the invitation or direction was an assurance of safety upon which he had a right to rely. Borst v. Lake Shore, etc., R. W. Co., 4 Hun. (N. Y.) 346, affirmed in 66 N. Y. 639; 4 Am. and Eng. Ency. of Law, p. 931; Cleveland, etc., R. W. Co. v. Keely, 138 Ind. 600; Elliott on Railroads, section 1157; Pennsylvania R. R. Co. v. Horst, 110 Pa. St. 226, 1 Atl. 217; Keech v. Rome, etc., R. R. Co., 13 N. Y. Supp. 149.
In the case last cited, the plaintiff approached a railroad crossing where the defendant’s engine and cars had stopped. The plaintiff inquired if it. was all right for him to go on. A servant on the engine replied: “It is all right, go ahead.” Plaintiff did so and went abreast of the engine and within forty feet of it, the steam began to escape from its “pop-whistle” and alarmed his horse, causing it to throw him from the buggy and breaking his leg. It appeared that the “pop-whistle” was not under the control of the engineer. The court held that although there was no evidence of negligence in the operation of the engine, the assurance of safety made to the plaintiff without reservation, implied the control of the engineer over the en *649 gine and its instruments of alarming sounds, and that the defendant was liable for plaintiff’s injuries received in acting upon the assurance. The court there said: “If the pop-whistle was not under control, but worked automatically, and was liable to go off whenever the engine stood still, these facts were known to the engineer. The plaintiff was not shown to know them. The question would then be whether it was negligent to stop the engine in advance of the plaintiff, instead of in his rear, and tell him to go ahead, without regard to the liability of the pop-whistle to go off. The assurance of- safety was made without reservation, and implied, we think, the control of the engineer over his engine and its instruments of alarming sounds.”
This reasoning is peculiarly applicable to the facts in this appeal. The engineer knew that the steam valve was not under his control. That it acted automatically, when the pressure attained to 140 pounds, and permitted the steam to escape at that point with a loud and unusual noise. He knew that the pressure had already reached this point, and was upon the very eve of exploding through the valve, when in response to the inquiry if it was safe to cross at that time, he answered that it was, and in this the flagman seems to have concurred, and signaled the parties to cross. This, under the circumstances, reasonably implied and carried with it the assurance that the engineer had control over his engine and its appliances, and that there would be no such alarming escape of steam as happened upon the occasion.
In view of the facts, we are of the opinion the court did not err in awarding judgment in favor of appellee upon the special verdict.
Appellant insists that upon the evidence, when tested by the decision in the former appeal, there can *650 be no recovery. Counsel for appellee, however, contend that the evidence is not in the record, and we are of the opinion that their contention must be sustained. The record recites that the defendant, on March 3, 1894, filed in the office of the clerk the longhand manuscript of the evidence adduced at the trial, which longhand manuscript is recited to be as follows: (Here follows what appears to be a longhand report of the evidence.) The trial judge certifies that this longhand manuscript was presented to him as a bill of exceptions on April 4,1894, and was signed by him on June 11, 1894.
If this could be regarded as a proper bill embracing the evidence, it would be clear that it had been filed before receiving the judge’s signature. Nowhere does the record disclose that what was intended as a bill of exceptions was filed after it received the signature of the judge on June 11, 1894. After a bill has been signed by the judge, it must be filed in order to become a part of the record. Makepeace v. Bronnenberg, 146 Ind. 243.
It follows for the reason stated that the evidence is not in the record and we cannot consider any question arising out of, or depending thereon.
Judgment affirmed.